**BEFORE THE**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA)**

**CASE NO.:19-00732**

IN THE MATTER OF ARBITRATION BETWEEN

| | | |
|---|---|---|
| JAMES WARFIELD, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | **AMENDED** |
| v. | ) | **STATEMENT OF CLAIM** |
| | ) | |
| ICON ADVISERS, INC., | ) | |
| ICON DISTRIBUTORS, INC. | ) | |
| | ) | |
| Respondent. | ) | |

 Claimant James Warfield ("Warfield"), by and through the undersigned attorneys of record,

submits his Statement of Claim against ICON Advisers, Inc. and ICON Distributors, Inc.

(collectively, "ICON").

## <u>INTRODUCTION</u>

 For nearly 25 years, Warfield has worked hard to build a successful career as a Broker

selling mutual funds. These efforts culminated in Warfield accepting a position with ICON as a

Wholesaler for its Mid-Atlantic Region. By any account, Warfield's employment with ICON was

an immediate success. In just a few short months, Warfield grew his region to second in the

company. And, soon thereafter, ICON promoted Warfield to the position of National Sales

Director ("NSD"). However, just as the parties were finalizing the terms of Warfield's NSD

contract, ICON abruptly terminated Warfield without justification. The perplexing nature of

Warfield's termination may be best explained by the words ICON's general counsel used when

terminating Warfield: "Come back to us when you're human."

Case 3:20-cv-00195-GCM   Document 3-1   Filed 03/30/20   Page 1 of 46

The evidence will show that this smear was in reference to Warfield's history of addiction. Warfield is a recovering alcoholic. He has been sober since 2007, but still bears the scars of his disease. Warfield was upfront with ICON about his condition at the time of his hiring and worked diligently so as to not allow his past struggles to interfere with his future success. Despite his efforts, it is now clear that ICON regarded him as disabled and treated him differently because of it. This conclusion is based on inappropriate statements made by ICON's leadership, as well as the bizarre nature of Warfield's termination, all of which is described in further detail below.

Making matters worse, following its wrongful termination of Warfield, ICON intentionally and maliciously defamed him when it filed a materially false Form U-5 Statement. As a result, Warfield had difficulty finding new employment and eventually was forced to accept a position selling annuities, earning significantly less than he made previously. Although Warfield has continued to work hard to rebuild his career and mitigate his losses, ICON's misconduct has permanently harmed his hard-earned reputation and greatly damaged his earning capacity. This Statement of Claim seeks to rectify for the harms Warfield suffered from ICON's wrongful, defamatory, and deceptive conduct.

## PARTIES AND JURISDICTION

This case arises under FINRA's Code of Arbitration Procedure for Industry Disputes, 13000 *et seq.* Warfield is a Broker regulated by FINRA (CRD # 1924965). Warfield was employed by ICON from May 2017 to November 2017. At all relevant times, Warfield was a citizen and resident of Mecklenburg County, North Carolina.

ICON Advisers, Inc., a Colorado corporation, is identified as an Investment Adviser Firm (CRD # 108268), on FINRA's BrokerCheck. ICON Distributors, Inc. is a Brokerage Firm regulated by FINRA (CRD # 28568).

Upon information and belief, ICON is a FINRA member, as defined in Rule 13100(q), and Warfield is an associated person, as defined in Rule 13100(b). Accordingly, this dispute requires arbitration under Rule 13200 because it is between a member and an associated person. Warfield seeks damages from ICON in excess of $5,000,000.

## STATEMENT OF FACTS

Warfield expressly reserves the right to amend the following factual allegations as discovery progresses in this arbitration and further information becomes available to him.

### I. **Background.**

Warfield first began working as a Broker registered with FINRA in 1994, and has worked with numerous investment firms throughout the country since then. Warfield's profile on BrokerCheck shows he has not received a single customer complaint—not one in nearly 25 years. The only disclosure on Warfield's record concerns a financial matter arising from his divorce that was resolved with FINRA in 2011. Other than this single disclosure, a clear aberration, Warfield's track record with FINRA, customers, and employers is impeccable, making ICON's mistreatment of him all the more damaging.

During his career, Warfield developed a strong reputation as a mutual funds wholesaler. Warfield's success has been highly dependent on his reputation and trustworthiness among financial advisers. Because of this strong reputation, Warfield was often a target of recruiters who consistently helped him find better employment with better pay. Warfield's reputation was so strong, in fact, that on two separate occasions when he found himself without employment after his firm was acquired, he quickly found a similar job with similar compensation.

Despite his professional success, Warfield has experienced significant challenges in his personal life. As previously noted, Warfield is an alcoholic. He has been in recovery since 2007, and, during much of that time, supported a spouse who was in and out of rehab dealing with her own addiction issues. Ultimately, the toll of addiction was simply too much, resulting in divorce and leaving Warfield as a single father to five young children. As is often the case, the divorce also led to financial troubles—specifically, tax liens. In addition, during his marital separation, Warfield's ex-wife failed to pay the mortgage on their marital home, which Warfield and his children had already moved out of. By the time Warfield learned of this, he was forced to sell the house in a short sale—resulting in his only FINRA disclosure.

## II.    **ICON Hires Warfield.**

Warfield was excited about the job opportunity with ICON and wanted to be up front about the significant personal challenges he overcame in his past. During his interview, Warfield disclosed his history with alcoholism and his current financial situation. He also made sure ICON was aware of his considerable responsibilities as a father. Given that his ex-wife was not capable of sharing parenting responsibilities, Warfield wanted ICON to understand his children's reliance on him.

Despite his personal challenges, ICON clearly was impressed with Warfield's sales record and professional accomplishments. Thus, in April 2017, ICON offered him the position of Regional Vice President ("RVP") and Wholesaler for the Mid-Atlantic Region reporting to ICON's Chief Marketing Officer Brian Callahan ("Callahan").[1] ICON was so impressed, in fact, that they

---

[1]    A true and correct copy of Warfield's Offer Letter is attached as Exhibit A.

informed Warfield during the interview process that he may be a future candidate for their open NSD position.

Warfield accepted ICON's offer of employment and began working on May 3, 2017.[2] Warfield initially anticipated earning in excess of $200,000 per year with ICON, which was a slight increase in what he was making at his prior employer. Over time, Warfield expected his annual income as an RVP and Wholesaler would grow to approximately $400,000 to $500,000 annually.

## III.    Warfield's Employment Is an Immediate Success.

Warfield hit the ground running and made an immediate impact at ICON. This is evidenced by the fact that ICON asked Warfield to lead a presentation on practice management at its national sales meeting occurring in June 2017—just one month after Warfield was hired. Then, in August 2017, ICON asked Warfield to spend a full week representing ICON at the annual conference hosted by LPL Financial LLC in Boston. Warfield was one of three representatives of ICON asked to attend the conference. Over the same time period, ICON began looking to Warfield to lead the sales staff and assist underperforming peers.

By September 2017—only four months after beginning his employment—Warfield had proven his worth and ICON formally offered him the NSD position. From that point forward, Warfield was immediately thrown into the NSD transition process, while still performing his duties as an RVP and Wholesaler. For example, Warfield was asked to engage in recruiting and hiring efforts and traveled to Texas in October 2017 to interview candidates for an open RVP position, which led to ICON ultimately hiring the candidate Warfield selected. ICON also asked Warfield

---

[2]    Warfield's official FINRA start date was May 10, 2017; however, he commenced training on May 3, 2017.

to prepare a budget for the NSD position and begin planning for ICON's 2018 National Sales Meeting.

Despite being pulled in multiple directions, Warfield continued to perform his duties as a regional wholesaler at a high level. Indeed, as of October 2017, the evidence will show that Warfield's region was ranked second overall in the company. This performance is nothing short of remarkable given that Warfield was only afforded fifty to seventy-five percent of his time to actually focus on sales.

## IV.     ICON and Warfield Negotiate Terms of NSD Agreement.

Throughout September and October 2017, ICON and Warfield negotiated over the terms of his employment as NSD. Although Warfield would still report to Callahan in the NSD position, ICON's General Counsel, Donald Salcito ("Salcito"), handled the contract negotiations.

The negotiation process caused Salcito to revisit some of Warfield's personal challenges. In particular, Salcito insisted that Warfield pay off his outstanding tax liens as a condition of his employment in the NSD position. To accomplish this, ICON offered Warfield a loan at a high interest rate; however, Warfield informed Salcito that he had secured a loan from a family member, Bill Dodge ("Dodge"), on much more favorable terms. Warfield provided Salcito with Dodge's contact information in the event ICON had any questions for him.

On October 18, 2017, Salcito sent Warfield an email proposal for the terms of his employment as NSD, including the requirement that Warfield secure a loan to cover the tax liens. After clarifying a few points concerning the terms of his compensation, on October 19, 2017, Warfield formally accepted the offer to become ICON's NSD. The next day, October 20, 2017, ICON's Chief Financial Officer Brian Harding emailed Warfield, stating: "Alright, that is great news!!!"

Case 3:20-cv-00195-GCM   Document 3-1   Filed 03/30/20   Page 6 of 46

**V. NSD Offer Withdrawn After Concerns Raised Over Warfield's Mental Well-Being.**

On October 24, 2017, Salcito sent Warfield a draft employment agreement for the NSD position. The following day, inexplicably, Callahan emailed Warfield, indicating that he wanted to meet to discuss a list of topics that oddly included Warfield's "mental well-being." This was not the first time Warfield had experienced inappropriate comments of this sort. Indeed, although ICON initially appeared to be understanding of Warfield's personal situation, Warfield found ICON's leadership was at times inappropriately inquisitive about his history with addiction, sometimes forcing him to reveal things about his past in a manner that made him uncomfortable. The perverse nature of these conversation was often amplified by the fact that they arose when Warfield's co-workers were themselves drinking at ICON events which Warfield felt pressured to attend.

Despite feeling that Callahan's slur was inappropriate and offensive, Warfield chose to ignore it and instead continued to focus on his job, including his ongoing recruiting efforts, developing sales strategies for the upcoming calendar year, creating a budget, and fine-tuning the final terms of the NSD employment agreement. Concerning the latter issue, Warfield emailed Callahan on October 31, 2017, after noticing that certain sales commissions had been omitted from his proposed NSD employment agreement. Although this omission was corrected in a revised draft sent the following day, November 1, 2017, Warfield was concerned because the agreement still reflected an incorrect October date.[3] Taking note of this error, Warfield contacted Salcito about correcting the date. Around 4:00 PM on November 1, 2017, Salcito informed Warfield that he was free to execute the agreement and correct the date by hand.

---

[3]    A true and correct copy of Warfield's proposed National Sales Director Employment Agreement is attached as Exhibit B.

The following morning, November 2, 2017, without prior notice or explanation, Salcito informed Warfield by email[4] that the NSD offer was withdrawn, stating:

ICON's National Sales Director offer to you is withdrawn. You will not be the ICON National Sales Director. ICON will be posting for the position of National Sales Director. You can continue as RVP in your territory, if you think you are capable, but it will be as a normal RVP . . . .

Warfield was devastated and confused. The evidence clearly established that Warfield was well-qualified for the NSD position and more than "capable" of maintaining his RVP position. Thus, Warfield understandably reached out to Salcito immediately to discuss the shocking change of events. In response, Salcito aggressively said that he had lost confidence in Warfield and reiterated what was stated in his email, before rudely hanging up on Warfield. Warfield attempted to call back, but was forced to leave a message when Salcito refused to answer.

Later that same day, Warfield spoke to Salcito and ICON's Associate General Counsel, Stephen Abrams ("Abrams"). During the call, Salcito falsely accused Warfield of misrepresenting the loan from Dodge and criticized Warfield's initial proposal for the NSD budget. Worst of all, Salcito went on a tirade insulting Warfield personally. Salcito told Warfield he was inhuman and needed help. It was clear to Warfield that Abrams was uncomfortable and believed Salcito's personal attacks on Warfield crossed the line.

Given Salcito's sudden about face, Warfield attempted to bring the withdrawal of his offer to the attention of Dr. Craig Callahan, ICON's founder and President, who also was the father of Warfield's supervisor, Brian Callahan. Dr. Callahan apparently had already been infected by Salcito's unfounded opinion of Warfield and informed Warfield that ICON would stand by Salcito's decision.

---

[4] A true and correct copy of Salcito's November 2, 2017 email to Warfield is attached as Exhibit C.

## VI. ICON Wrongfully Terminates and Defames Warfield.

The following Monday, November 6, 2017, again without prior notice or explanation, ICON terminated Warfield's employment without cause. In a weak effort to support ICON's illegal decision, Callahan referred to a few minor issues that had been discussed and resolved months earlier—before ICON had even offered Warfield the NSD promotion. Callahan also reiterated Salcito's criticism regarding the proposed budget, as well as his false allegation that Warfield misrepresented the personal loan from Dodge. He made no attempt, however, to explain why these issues disqualified Warfield from the NSD position that everyone had enthusiastically supported just a few days earlier, let alone why it necessitated the termination of Warfield's employment in his original RVP position.

Adding insult to injury, on December 6, 2017, Warfield received a letter from Abrams enclosing the Form U-5 Uniform Termination Notice that ICON filed with FINRA.[5] To Warfield's surprise, the U-5 Statement neither referenced concerns regarding any alleged misrepresentation on his part, nor did it include any of the minor issues that Callahan referenced in the termination call one month earlier. Instead, ICON claimed in the U-5 Statement that Warfield was:



(Exhibit D).

Each of these purported reasons are demonstrably false. At no point did anyone at ICON express concerns about Warfield's      . Presumably, if such concerns existed, Callahan would have met with Warfield consistent with his responsibilities as a licensed Series 24 Supervisor. Callahan never met with Warfield to discuss      , nor did he (or anyone

---

[5]     A true and correct copy of Warfield's U-5 Statement is attached as Exhibit D.

else) ever criticize Warfield's . In fact, ICON did just the opposite by asking

Warfield to present on ██████████████ at its National Sales Meeting, congratulating him on

his ██████████████ and then promoting him to NSD.

Moreover, there simply is no merit to the contention that ICON ███████████████

████████████████████████████████████████. On the contrary, the evidence

will show that ICON ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████.

## VII.    Warfield Is Damaged by ICON's Wrongful Termination and Defamation.

The evidence will show that ICON's unlawful actions have caused Warfield significant

damages, including loss of income and permanent harm to his reputation and future earning

capacity.   Unlike previous times when Warfield was forced to search for new employment,

recruiters were no longer ready and willing to help.   Warfield struggled to find a new job and had

to face questions about the defamatory statements on his U-5 Statement, which were difficult to

explain given that they were completely untrue.   Although Warfield obviously was well-qualified

and diligently sought employment in several open positions as a mutual funds wholesaler, he found

it difficult to even get an interview, let alone a job offer.

Finally, in March 2018, after four months of unemployment, Warfield accepted a position

selling annuities at AIG, making significantly less than he made at ICON.   Warfield was forced to

overcome many challenges working at AIG.   First, he had to learn the annuities market (where he

had no prior experience) and develop new customer relationships. Second, he found his reputation among his prior business contacts has been damaged with many of them concerned about his U-5 Statement and his swift departure from ICON. Despite these challenges, Warfield proved himself at AIG and recently was moved to a position where he again can focus on selling mutual funds. Nonetheless, because Warfield focuses on wholesaling, his primary business contacts are financial advisers who are more inclined to review and believe disclosures on a U-5 Statement, understanding the industry far more than the average consumer. Consequently, Warfield continues to suffer damages as a result of ICON's misconduct and defamation. In 2018, Warfield anticipated he would earn $400,000 to $550,000 as NSD for ICON, and he expected this number would grow to the $650,000-$750,000 range in the future. In contrast, his actual 2018 earnings at AIG were $167,000.

Although Warfield was without income from early November 2017 to March 2018, he continued to support his family and went forward with the loan from Dodge on February 8, 2018.[6] Thereafter, on March 12, 2018, Warfield paid off his outstanding tax liens, proving that Salcito's concerns were completely unfounded.

**\*\*\*\*\***

On January 16, 2019, Warfield's counsel sent ICON a letter in a good faith effort to resolve ICON's wrongful termination and defamation of Warfield, among other misconduct outlined in this Statement of Claim.[7] Salcito's response further demonstrates his bias, bad faith, and

---

[6] A true and correct copy of the Promissory Note from Dodge is attached as Exhibit E.

[7] A true and correct copy of the January 16, 2019 Letter is attached as Exhibit F.

willingness to make false representations concerning Warfield.[8]  Rather than engage in a good

faith discussion or attempt to justify ICON's actions, Salcito raised for the first time—more than

15 months after terminating Warfield—the claim that Warfield owes ICON "at least $97,000.00"

and demanded that Warfield pay this indefinite amount.  Salcito further threatened that FINRA

would play a role in enforcing Warfield's payment of this claimed amount.  On top of this, Salcito

claimed—again for the first time—that Warfield "violated numerous FINRA rules and ICON

policies," directly contradicting the disclosures ICON already made to FINRA in Warfield's U-5

Statement.  Indeed, ICON checked "No" for questions 7A, 7B, 7C, 7D, and 7E where it would

have been required to check "Yes" and disclose violations of this nature, if they were true.  (*See*

Exhibit D).

Accordingly, Warfield files this Statement of Claim out of necessity. ICON refuses to

recognize its mistreatment of Warfield and the affect it has had on his career, professional

reputation, family, and financial well-being.  Warfield's damages are continuing and ongoing with

his earning capacity diminished and the U-5 Statement serving as a constant impediment to his

recovery from the damage ICON has caused.

<u>**STATEMENT OF CLAIMS**</u>

Warfield brings the following legal claims against ICON for the misconduct described

above.

**I.     Wrongful Termination Without Just Cause**

There is long-established precedent that an inherent component of an agreement to arbitrate

employment disputes is the requirement that employment may only be terminated with just cause.

---

[8]     A true and correct copy of Salcito's February 11, 2019 Letter is attached as <u>Exhibit G</u>. Although the
letter is not dated, it was received by email on February 11, 2019.

*See Shearson Hayden Stone, Inc. v. Liang,* 653 F.2d 310, 313 (7th Cir. 1981) ("It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for 'just cause.'"). Because FINRA requires arbitration for disputes of this nature between a member, like ICON, and an associated person, like Warfield, "some standard of discernable cause is inherently required . . . . to determine whether the firing was justified." *Paine Webber, Inc. v. Agron*, 49 F.3d 347, 352 (8th Cir. 1995). ICON terminated Warfield unjustifiably and without cause. The statements ICON made in the U-5 Statement are demonstrably false and appear to be an after-the-fact fiction created by ICON in a misguided attempt justify Warfield's termination. Because there is no just cause for Warfield's termination, it was wrongful and in violation of public policy.

## II. Defamation – Libel *Per Se*

Libel *per se* arises when a publication "tends to impeach a person in that person's trade or profession." *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29, 568 S.E.2d 893, 898 (2002); *see also Eli Global, LLC v. Heavner*, 794 S.E.2d 820, 825 (N.C. Ct. App. 2016) ("'It is well settled that false words imputing to a merchant or business man conduct derogatory to his character and standing as a business man and tending to prejudice him in his business are actionable, and words so uttered may be actionable *per se*.'" (quoting *Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955))). ICON's false statements in the U-5 Statement are defamatory and amount to libel *per se* because they impeach Warfield in his profession. It is well-known that even one negative statement on a U-5 Statement may hamper a broker's ability to remain in the securities business. Derogatory or false U-5 Statements can effectively "blackball" a broker from the industry. Arbitrators may award compensatory damages and punitive damages for such

misconduct. *Acciardo v. Millenium Sec. Corp.*, 83 F. Supp. 2d 413, 419 (S.D.N.Y. 2000). The U-5 Statement ICON submitted for Warfield is defamatory and requires expungement.

## III.    Unfair and Deceptive Trade Practices – N.C. Gen. Stat. § 75-1 *et seq.*

N.C. Gen. Stat. § 75-1.1 provides that: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."    North Carolina courts have determined that defamation amounts to unfair and deceptive conduct. *Ellis v. N. Star Co.*, 326 N.C. 219, 225–26, 388 S.E.2d 127, 131 (1990). Accordingly, ICON's defamation of Warfield, as described above, is an unfair and deceptive act permitting Warfield to recover treble damages under N.C. Gen. Stat. § 75-16.

### CONCLUSION

ICON's actions in this case are indefensible, egregious, and offensive.    ICON has permanently damaged Warfield and must be punished for its unlawful actions.  To that end, Warfield requests the full damages prescribed by law, including but not limited to back pay, front pay, compensatory damages, punitive damages, treble damages, and pre- and post-judgment interest, in excess of $5,000,000.  Warfield also requests payment of all fees and costs arising in this action, including but not limited to reasonable attorneys' fees.  Finally, Warfield seeks an expungement of the defamatory language in the U-5 Statement.

/s/ *Gary J. Rickner*
Gary J. Rickner
N.C. State Bar I.D. No.:  025129
email:  gjr@wardandsmith.com
Marla S. Bowman
N.C. State Bar I.D. No.:  49097
email:  msbowman@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC  27636-3009
Telephone:  919.277.9100
Facsimile:  919.277.9177

ND: 4844-9396-9544, v. 7

# EXHIBIT A

April 12, 2017

Jim Warfield
1231 Reverdy Lane
Matthews, NC 28105

Dear Mr. Warfield:

It is my pleasure to extend the following offer of employment to you on behalf of ICON Advisers, Inc. This offer is contingent upon your satisfactory completion of a background check, as more fully explained below.

**Title**: Regional Vice President (RVP)

**Report to**: Brian Callahan

**Base Salary**: Will be paid in semi-monthly installments of $3,150, which is equivalent to $75,600 on an annual basis, and subject to deductions for taxes and other withholdings as required by law or the policies of the company. Additionally, current commissions and sales bonuses will be paid according to the following: All mutual funds and SBI sales are paid at a 20 basis points commission. Ohio National sales are paid at 7 basis points. Portfolio sales (ITAPs) are paid at 25 basis points. Clawbacks on commissions are 100% for sales staying 60 days or less and 75% on sales staying between 61 and 120 days. Sales bonuses will be paid $25,000 for territory sales of $50 million, with an additional $12,500 when territory sales reach $75 million and $100 million per employee per calendar year. Fund and Portfolio sales count towards your goal, but Ohio National sales do not count towards your goal. Other quarterly, individual or team bonuses may be paid from time to time at your manager's discretion. Your goals and compensation are subject to change at any time at the discretion of ICON Advisers. Notwithstanding anything contained in this paragraph, if you are employed by ICON and wholesaling ICON products and services in good faith, then for the first six months of your employment with ICON, ICON will guarantee you a minimum gross compensation of salary plus commissions of $25,000 per month. This arrangement will terminate automatically at the beginning of your seventh month of employment or pursuant to the terms outlined below.

**Benefits**: The current, standard company health, life, dental, long-term disability, and vision coverage are generally supplied per company policy.

**Vacation**: Vacation is accrued monthly for the first year to a maximum of 15 days.

**Start date**: April 30, 2017

There will be a 90 day review. The company also gives annual reviews.

If training takes place which creates a substantial cost to the company during the first two years of your employment, ICON reserves the right to request payment to cover the cost of that training should your employment with ICON terminate for any reason. In addition, if you are terminated by ICON for cause, or if you leave ICON at any time during your first 12 months of employment, you shall pay ICON the difference between the $25,000 guarantee provided to you during the first 6 months and your actual earned commissions during that 6 month period. You understand that as an ICON employee you will be asked to comply with company policies regarding, without limitation, confidentiality, company property, expense policies and compliance with the rules and regulations of the Securities and Exchange Commission and the Financial Industry Regulatory Authority, the violation of which could lead to your termination for cause.

Nothing in this letter should be construed as a guarantee of employment. Your employment with ICON Advisers, Inc. is at-will and either party can terminate the relationship at any time with or without cause and with or without notice.

You acknowledge that this offer letter represents the entire agreement between you and ICON Advisers, Inc. with respect to the subject matter set forth in this letter. This offer letter, and your continued employment with ICON Advisers, are subject to completion of a background check, the satisfaction of which shall be in the sole discretion of ICON Advisers, and your ability to perform the responsibilities of an RVP with all required licenses. This letter supersedes any prior agreements, understandings, or negotiations, whether written or oral, relative to your employment at ICON. This offer letter can be amended only through a written document, formally executed by all parties.

If you are in agreement with the above terms, please sign below. This offer is in effect for two business days.


_____
Brian Callahan

_____
Jim Warfield


4/17/17
_____
Date

4/13/17
_____
Date

# EXHIBIT B

## AGREEMENT BETWEEN ICON ADVISERS, INC. and JAMES WARFIELD

This Agreement is dated October __, 2017 and is entered into by and between James Warfield ("Warfield" or "Employee") and ICON Advisers, Inc., a Colorado corporation, and all its affiliates, including ICON Distributors, Inc., ("ICON" or the "Company"). Collectively, Employee and Company may be referred to herein as the "Parties".

WHEREAS, Warfield is currently employed by ICON as a Regional Salesman in the Southeast United States (an "RVP"); and

WHEREAS, the Parties have discussed promoting Warfield from an RVP to National Sales Director ("NSD"), a management position reporting to the ICON Executive Committee; and

WHEREAS, ICON has agreed to promote Warfield to NSD, where he will have access to ICON's trade secrets, subject to the terms and conditions set forth below; and

WHEREAS, the Parties acknowledge that Employee will benefit substantially from this Agreement.

Now therefore, in consideration of Employee's promotion to National Sales Director, the training and experience he may receive in connection with such engagement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agree as follows:

### Section 1.    Definitions

As used in this agreement (this "Agreement"), the terms specified below have the following meanings:

**"Competing Business"** means any enterprise of any nature whatsoever, wherever located, whether commercial or non-profit, that competes, directly or indirectly, or that is preparing to compete, directly or indirectly, with any aspect of the business of the Company. Without limiting the generality of the foregoing, a Competing Business includes any person or entity whose efforts involve: (a) the sale or distribution of mutual fund shares, financial products or services, or investment advice; and/or (b) the offering of any investment advice or financial products or services, whether as a registered investment adviser, broker-dealer, or otherwise.

**"Confidential Information"** means any information related to the business or other affairs of the Company or its affiliates that is not generally available to the public, and that: (a) is conceived, compiled, developed, modified, improved or discovered by Employee, whether solely or jointly with others, during the Term (as defined herein); or (b) is or has been provided to, received by, or otherwise becomes known to Employee in connection with Employee's engagement by or with the Company. Without limiting the generality of the foregoing, Confidential Information includes any information arising out of, in connection with, or relating, directly or indirectly, to trade secrets (including, without limitation, the names, contact information, financial profiles, risk tolerances, and all other similar information of all clients, potential clients and prospects), products, services, finances, business plans, marketing plans, legal affairs, suppliers, opportunities, contracts, or assets of the Company or its affiliates. Confidential Information also includes any information that has been made available to the Company by its clients or other third parties that the Company is obligated to keep confidential.

**"Inventions and Works"** means any methodology, system, composition, work of authorship, computer program, software, product, device, technique, formula, algorithm, function, know-how, method, process, procedure, improvement, modification, discovery, or invention, whether or not patentable and whether or not reduced to practice, that is: (a) within the scope of the Company's business or demonstrable research or investigations of the Company, or results from or is

suggested by any work performed by Employee for the Company; and (b) created, conceived, reduced to practice, developed, discovered, invented, or made by Employee during the Term, whether solely or jointly with others, and whether or not while engaged in performing work for the Company.

"**Materials**" means any product, prototype, sample, model, document, diskette, tape, storage media, picture, drawing, design, recording, report, proposal, paper, lists, note, writing, or other tangible item which in whole or in part contains, embodies or manifests, whether in printed, handwritten, coded, electronic, magnetic, or other form, any Confidential Information or Inventions and Works.

"**Proprietary Rights**" means any patent, copyright, mask work, trade secret, trademark, trade name, service mark, or other protected intellectual property right in or to any Confidential Information, Inventions and Works, or Materials, including, but not limited to, any intellectual property right of the Company in and to the Quantitative Investment System.

"**Term**" means the period from the beginning of Employee's engagement with the Company, whether on a full-time, part-time, or consulting or as an intern, through the last day of such engagement.

**Section 2.** **Confidential Information, Inventions and Works, Materials, and Proprietary Rights**

**2.1** As between the Company and Employee, the Company is, and shall be deemed for all purposes, the sole owner of all Confidential Information, Inventions and Works, Materials, and Proprietary Rights. To the extent eligible for such treatment, all Inventions and Works will constitute "works made for hire" under applicable laws. In addition, Employee hereby acknowledges and agrees that Confidential Information that has been or may be disclosed to Employee in connection with Employee's engagement by or with the Company constitutes, and shall be deemed for all purposes, a "trade secret" (as that term is defined by Colorado Revised Statute § 7-74-102(4)) of the Company.

**2.2** Employee hereby irrevocably assigns and transfers to the Company, without any separate compensation, all right, title, and interest that Employee may now or hereafter have in the Confidential Information, Inventions and Works,

Materials, and Proprietary Rights, subject to the limitations set forth in the Notice following Section 2.5 below. This assignment and transfer is independent of any obligation or commitment made to Employee by the Company. Further, Employee hereby waives any moral rights that Employee may have in or to any Confidential Information, Inventions and Works, Materials, and Proprietary Rights. Employee will take such action (including, but not limited to, the execution, acknowledgment, delivery, and assistance in preparation of documents or the giving of testimony) as may be requested by the Company to evidence, transfer, vest, or confirm the Company's right, title, and interest in the Confidential Information, Inventions and Works, Materials, and Proprietary Rights and the license rights described in Section 2.5 below

**2.3** Except as required in connection with the performance of obligations arising out of or in connection with Employee's engagement by or with Company, or as authorized by the Company in writing, Employee will not, during or after the Term: (a) use, disclose, publish, or distribute any Confidential Information, Inventions and Works, Materials, or Proprietary Rights; or (b) remove any Materials from the Company's premises, computer system, or network. Employee will hold all Confidential Information, Inventions and Works, Materials, and Proprietary Rights in trust for the Company, and Employee will deliver them to the Company upon request and, in any event, at the end of the Term.

**2.4** Employee will promptly disclose to the Company all (i) Confidential Information; (ii) Inventions and Works; (iii) Materials; (iv) Proprietary Rights; as well as (v) any business opportunity, which (a) relates to the business of the Company and (b) comes to Employee's attention during the Term. During the Term and for the duration of the noncompetition covenant specified in Section 3 below, without the prior written consent of the Company, Employee will not take advantage of, or divert any such opportunity for the benefit of Employee or anyone other than the Company.

**2.5** Employee hereby irrevocably grants to the Company, to the full extent of Employee's rights in and to the same, a fully paid-up, perpetual, worldwide right and license, with the right to sublicense, disclose, offer, distribute, import, make,

have made, make derivative works of, use, and otherwise exploit any trade secrets, copyrights, Confidential Information, or Inventions and Works belonging to Employee or any third party that Employee discloses to the Company, or its personnel or use in any Inventions and Works or Materials of the Company.

**NOTICE:** Notwithstanding any other provision of this Agreement to the contrary, this Agreement does not obligate Employee to assign or offer to assign to the Company any of Employee's rights in an invention for which no equipment, supplies, facilities, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the invention relates: (i) directly to the business of the Company; or (ii) to the Company's actual or demonstrably anticipated research and development; or (b) the invention results from or arises out of any work performed by Employee for the Company.

## Section 3.    Non-solicitation

**3.1**    During the Term and for a period of two (2) years after the end of the Term, and on a national basis, Employee will not engage in, be employed by, consult with, perform services for, participate in the ownership, management, control, or operation of, either directly or indirectly, any Competing Business that solicits any clients, employees or Confidential Information of the Company.    For purposes of this Section 3.1, Employee will not be considered to be employed by, consulting or performing services for, or participating in the ownership, management, control, or operation of any Competing Business solely on account of Employee's passive ownership of less than one percent (1%) of the outstanding publicly traded capital stock or other publicly traded equity interests in any such Competing Business.

**3.2**    During the Term and for a period of two (2) years after the end of the Term, Employee will not hire or induce, or attempt to induce, any employee or consultant of the Company to leave such employment or relationship with the Company to engage in, be employed by, perform services for, participate in, or otherwise be connected with, either directly or indirectly, Employee or any entity or enterprise with which Employee is in any way

associated, whether or not it is a Competing Business.

## Section 4.    No Conflicting Obligations

**4.1**    Employee's execution, delivery, and performance of this Agreement and the performance of Employee's other obligations and duties to the Company will not cause any breach, default, or violation of any employment, nondisclosure, confidentiality, consulting, or other agreement to which Employee is a party or by which Employee may be bound.

**4.2**    Employee will not use in performance of Employee's work for the Company or disclose to the Company any trade secret, confidential, or proprietary information of any prior employer or other person or entity if and to the extent that such use or disclosure may cause any breach, default, or violation of any obligation or duty that Employee owes to such other person or entity under any agreement or applicable law.    Employee's compliance with this Section 4.2 will not prohibit, restrict or impair the performance of Employee's work, obligations and duties to the Company.

**4.3**    Employee will not: (a) make any false, misleading, or disparaging representations or statements with regard to the Company, or the products or services of the Company; or (b) make any statement that may impair or otherwise adversely affect the goodwill or reputation of the Company.

## Section 5.    Compensation

**5.1**    Effective January 1, 2018 (the "Effective Date"), and for a period of one (1) year, Company will pay Employee a salary of $180,000, as follows: (a) $20,000 the first month; (b) $19,000 the second month; (c) $18,000 the third month; (d) $17,000 the fourth month; (e) $16,000 the fifth month; and (f) $15,000 the sixth month.    Thereafter, and until such time as Company in its sole discretion determines otherwise, Company will pay Employee $12,500 a month (the equivalent of $150,000 per year).    All monthly sums may be pro-rated as necessary if the Parties terminate their relationship mid-month.

**5.2**    In addition to the arrangement set forth in Section 5.1, Company will pay Employee as follows: (a) an additional 25 basis points on Employee's sales in North and South Carolina (the

"Carolinas" or the "Territory"); (b) a bonus of $25,000 on Employee's sales in North and South Carolina for sales of between $30,000,000 and $49,999,999 for the 12-month period beginning on the Effective Date; (c) a bonus of $12,500 on Employee's sales in North and South Carolina for sales in excess of $50,000,000 for the 12-month period beginning on the Effective Date; (d) one (1) basis point on all sales outside of the Territory in Employee's capacity as National Sales Director ("NSD") for sales by supervised ICON employees up to and including $300,000,000 for the 12-month period beginning Effective Date; and four (4) basis points on all sales outside of the Territory in Employee's capacity as NSD for sales by supervised ICON employees in excess of $300,000,000 for the 12-month period beginning the Effective Dates. All compensation thresholds in this Section 5.2 are calculated for sales of the ICON Funds, pursuant to existing conditions as they may be changed from time to time, and are exclusive of Ohio National (ONAT), and Strategy Based Investing (SBI) sales and are subject to any applicable clawback provisions as may be amended from time to time (currently 100% for sales staying 60 days or less and 75% on sales staying between 61 and 120 days).

**5.3** Notwithstanding anything else in this Section 5, Company shall not pay Employee on sales in his capacity as NSD until and unless Employee successfully passes and receives the FINRA Series 24 or 26 registration and is licensed and permitted to sell in the state generating the sale.

**5.4.** Employee understands that Company is relying upon his representation that he has secured a loan of $120,000 with which to satisfy his outstanding obligations to the IRS as a condition for entering into this Agreement. Employee understands further that satisfaction of this debt to the IRS is a condition precedent to Company's attempting to secure Employee's licensing or registration with every state as NSD and, further, that each state has the discretion to accept or reject that licensing or registration, regardless of whether or not Employee pays the IRS and regardless of whether or not Employee secures his Series 24 or 26 registration.

## Section 6.    Miscellaneous

**6.1** This Agreement is not a contract of employment and no rights of employment are hereby created. Employee is an "at will" employee. Employee has not been promised and has no expectations of continued employment. Unless otherwise set forth in a written agreement signed by Employee and the Company, Employee's engagement with the Company may be terminated at any time, with or without cause, by Employee or the Company. This Agreement will survive any termination of the Term or Employee's engagement.

**6.2** In the event of any breach or default under this Agreement by Employee, the Company will suffer irreparable harm and have no adequate remedy at law. In the event of any such breach or default by Employee, or any threat of such breach or default, the Company, in addition to any other available remedy, is hereby entitled to injunctive relief, specific performance, and other equitable relief without the necessity of posting a bond or other security. Further, in any legal action or other proceeding in connection with this Agreement (e.g., to recover damages or other relief), ICON will be entitled recover, in addition to any other relief to which it may be entitled, its reasonable attorneys' fees and other costs incurred in that action or proceeding. The rights and remedies of the Company under this Section 6.2 are in addition to, and not in lieu of, any other right or remedy afforded to the Company under any other provision of this Agreement, by law or otherwise.

**6.3** This Agreement will be enforced to the fullest extent permitted by applicable law. If for any reason any provision of this Agreement is held to be invalid or unenforceable to any extent, then: (a) such provision will be interpreted, construed, or reformed only to the extent required to render the same valid, enforceable, and consistent with the original intent underlying such provision; and (b) such invalidity or unenforceability will not affect any other provision of this Agreement or any other agreement between the Company and Employee. If the invalidity or unenforceability is due to the unreasonableness of the scope or duration of the provision, the provision will remain effective for the largest scope and longest duration as may be determined to be reasonable.

**6.4** The failure of the Company to insist upon or enforce strict performance of any provision of this Agreement or to exercise any of its rights or remedies under this Agreement will not be

construed as a waiver or a relinquishment to any extent of the Company's rights to assert or rely on any such provision, right, or remedy in that, or any instance; rather, the same will be and remain in full force and effect.

**6.5** This Agreement sets forth the entire Agreement, and supersedes any and all prior agreements, between Employee and the Company with regard to the Confidential Information, Inventions and Works, Materials, and Proprietary Rights of the Company. This Agreement is independent of any other written agreements between Employee and the Company regarding other aspects of Employee's engagement. This Agreement may not be amended, except in a writing signed by Employee and an authorized representative of the Company.

**6.6** This Agreement will be governed by the laws of the State of Colorado without regard to its choice of law principles to the contrary. Employee irrevocably consents to the jurisdiction and venue of the state and federal courts located in the city and county of Denver, Colorado, and waive any objection thereto in connection with any action relating to this Agreement. Further, Employee covenants and agrees that he will not bring any action relating to this Agreement in any other court.

**6.7** Employee has carefully read all of the provisions of this Agreement and agrees that: (a) the same are necessary for the reasonable and proper protection of the Company's business; (b) the Company has been induced to enter into and continue its relationship with Warfield in reliance upon his compliance with the provisions of this Agreement; (c) every provision of this Agreement is reasonable with respect to its scope and duration; (d) this is a legal document and he has been advised to consult with an attorney; (e) he understands and consents to the provisions of this Agreement and recognizes the opportunities associated with this promotion; and (f) he has received a copy of this Agreement.

**AGREED:**

_____
James Warfield

**ACCEPTED:**

**ICON Advisers, Inc.**

By:_____
      Brian T. Callahan

Its:_____       Dated:_____

# EXHIBIT C

| | |
|---|---|
| **From:** | Don Salcito |
| **Sent:** | Thursday, November 02, 2017 11:14 AM |
| **To:** | Jim Warfield |
| **Cc:** | Craig Callahan; Brian Callahan; Brian Harding; Stephen Abrams |
| **Subject:** | NSD |

Jim:

I tried calling you, but was unable to reach you.  After you get this you can call me.   ICON's National Sales Director offer to you is withdrawn.  You will not be the ICON National Sales Director.  ICON will be posting for the position of National Sales Director.  You can continue as RVP in your territory, if you think you are capable, but it will be as a normal RVP.  Your guarantee ended on November 1, and it will not be extended.  Good luck with your territory.

Don Salcito

# EXHIBIT D




5299 DTC Boulevard, Suite 1200
Greenwood Village, CO 80111
800.828.4881 phone | 303.790.1600 local
www.InvestwithICON.com

December 6, 2017

**<u>Via Overnight Delivery</u>**

Mr. James Warfield
1231 Reverdy Lane
Matthews, NC  28105

**Re: Termination Notice – Form U5**

Dear Mr. Warfield:

In accordance with Financial Industry Regulatory Authority ("FINRA") regulations, enclosed for your records is a copy of the Form U5 Uniform Termination Notice, terminating your association with ICON Distributors, Inc.

Should you attempt to obtain registration with another FINRA member broker/dealer, you may be asked to present a copy of the enclosed Form U5 to your new employer. Please note that you have two years from your termination date in order to affiliate with another broker/dealer before your registration(s) will lapse, requiring you to retake qualifying exam(s).

Additionally, you have an ongoing obligation under the FINRA Conduct Rules to notify FINRA of any change in your mailing address for two years following your date of termination. A letter advising FINRA of such changes should be sent to the following name and address:

> CRD Address Changes
> P.O. Box 9495
> Gaithersburg, MD  20898-9495

Do not hesitate to call this office if you have any questions.

Sincerely,

Stephen E. Abrams

Enclosure

**ICON DISTRIBUTORS, INC.**(28568)

**Rev. Form U5 (05/2009)**

**Individual Name: WARFIELD, JAMES ANTHONY (1924965)**

**U5 Full - Filing ID: 47789566**

**Filing Date: 12/05/2017**

### NOTICE TO THE INDIVIDUAL WHO IS THE SUBJECT OF THIS FILING

Even if you are no longer registered you continue to be subject to the jurisdiction of regulators for at least two years after your registration is terminated and may have to provide information about your activities while associated with this firm. Therefore, you must forward any residential address changes for two years following your termination date or last Form U5 amendment to: CRD Address Changes, P.O. Box 9495, Gaithersburg, MD 20898-9495.

#### 1. General Information

| First Name: | Middle Name: | Last Name: | Suffix: |
|---|---|---|---|
| JAMES | ANTHONY | WARFIELD | |

| *Firm* CRD #: | *Firm* Name: | *Firm* NFA #: | |
|---|---|---|---|
| 28568 | ICON DISTRIBUTORS, INC. | | |

| Individual CRD #: | Individual SSN: | Individual NFA #: | *Firm* Billing Code: |
|---|---|---|---|
| 1924965 | xxx-xx-xxxx | | |

**Office of Employment Address:**

| CRD Branch # | NYSE Branch Code # | Firm Billing Code | Address | Private Residence | Type of Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| | | | 1231 Reverdy Lane Matthews, NC 28105 United States | Yes | Located At | 04/30/2017 | 11/06/2017 |
| BD Main | | | 5299 DTC BOULEVARD SUITE 1200 GREENWOOD VILLAGE, CO 80111 UNITED STATES | No | Supervised From | 04/30/2017 | 11/06/2017 |

#### 2. Current Residential Address

| From | To | Street Address |
|---|---|---|
| 12/2016 | PRESENT | 1231 Reverdy Lane Matthews, NC 28105 United States |

#### 3. Full Termination

**Is this a *FULL TERMINATION*?** ⊙ Yes ○ No

Note: A "Yes" response will terminate ALL registrations with all SROs and all *jurisdictions*.

**Reason for Termination:** Discharged

**Termination Explanation:**

If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:

███████████████████████████████████████

███████████████

## 4. Date of Termination

**Date Terminated (MM/DD/YYYY): 11/06/2017**

A complete date of termination is required for *full termination*. This date represents the date the *firm* terminated the individual's association with the *firm* in a capacity for which registration is required.

For *partial termination*, the date of termination is only applicable to post-dated termination requests during the renewal period.

Notes: For *full termination*, this date is used by *jurisdictions*/SROs to determine whether an individual is required to requalify by examination or obtain an appropriate waiver upon reassociating with another *firm*.

The *SRO/jurisdiction* determines the effective date of termination of registration.

## 6. Affiliated Firm Termination

Is this a *multiple termination* with one or more *firms affiliated* with the *filing firm*?
If "yes" to the above question and the termination requests for the *filing firm* are identical to the termination requests of each *affiliated firm*, then mark the same termination request for each affiliate.
If the termination requests of the *affiliated firm(s)* differ from those of the *filing firm*, complete the *SRO* and/or *jurisdiction* sections for each *affiliated firm*.

◉ ○ No
Yes

### Affiliated Firm Termination for Affiliate CRD#: 108268

**Affiliated Firm CRD #**
108268

**Affiliated Firm Name**
ICON ADVISERS, INC.

**Affiliated Firm Billing Code:**

**Office of Employment Address:**

| CRD Branch # | NYSE Branch Code # | Firm Billing Code | Address | Private Residence | Type of Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| | | | 1231 Reverdy Lane Matthews, NC 28105 United States | Yes | Located At | 04/30/2017 | 11/06/2017 |
| IA Main | | | 5299 DTC BOULEVARD SUITE 1200 GREENWOOD VILLAGE, CO 80111 United States | No | Supervised From | 04/30/2017 | 11/06/2017 |

## 7. Disclosure Questions

IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IN SECTION 7 IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S). IF THE INFORMATION IN SECTION 7 HAS ALREADY BEEN REPORTED ON FORM U4 OR FORM U5, DO NOT RESUBMIT DRPS FOR THESE ITEMS.

REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALICIZED WORDS.

**Disclosure Certification Checkbox (optional):** ☐

By selecting the Disclosure Certification Checkbox, the *firm* certifies that (1) there is no additional information to be reported at this time; (2) details relating to Questions 7A, 7C, 7D and 7E have been previously reported on behalf of the individual via Form U4 and/or amendments to Form U4 (if applicable); and (3) updated information will be provided, if needed, as it becomes available to the *firm*. Note: Use of "Disclosure Certification Checkbox" is optional

### Investigation Disclosure

|  | Yes | No |
|---|---|---|
| **7A.** Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or *self-regulatory organization* with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page.) | ○ | ◉ |

### Internal Review Disclosure

|  | Yes | No |
|---|---|---|
| **7B.** Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct? | ○ | ◉ |

### Criminal Disclosure

|  | Yes | No |
|---|---|---|
| **7C.** While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual: | | |
|    **1.** convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to any *felony*? | ○ | ◉ |
|    **2.** *charged* with any *felony*? | ○ | ◉ |
|    **3.** convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a *misdemeanor involving*: investments or an *investment-related* business, or any fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
|    **4.** *charged* with a *misdemeanor* specified in 7(C)(3)? | ○ | ◉ |

### Regulatory Action Disclosure

|  | Yes | No |
|---|---|---|
| **7D.** While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual *involved* in any *disciplinary action* by a domestic or foreign governmental body or *self-regulatory organization* (other than those designated as a "*minor rule violation*" under a plan approved by the U.S. Securities and Exchange Commission) with jurisdiction over the *investment-related* businesses? | ○ | ◉ |

### Customer Complaint/Arbitration/Civil Litigation Disclosure

|  | Yes | No |
|---|---|---|

https://crd.firms.finra.org/ERM/PrintHist/U5/U5H_AllSections.aspx?FilingPk=47789566&Rl=      3/6

**7E.** **1.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual named as a respondent/defendant in an *investment-related*, consumer-initiated arbitration or civil litigation which alleged that the individual was *involved* in one or more *sales practice violations* and which:

    **(a)** is still pending, or;

    **(b)** resulted in an arbitration award or civil judgment against the individual, regardless of amount, or;

    **(c)** was settled, prior to 05/18/2009, for an amount of $10,000 or more, or;

    **(d)** was settled, on or after 05/18/2009, for an amount of $15,000 or more?

**2.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated (written or oral) complaint, which alleged that the individual was *involved* in one or more *sales practice violations*, and which

    **(a)** was settled, prior to 05/18/2009, for an amount of $10,000 or more, or;

    **(b)** was settled, on or after 05/18/2009, for an amount of $15,000 or more?

**3.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated, written complaint, not otherwise reported under questions 7(E)(2) above, which:

    **(a)** would be reportable under question 14I(3)(a) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*; or

    **(b)** would be reportable under question 14I(3)(b) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*.

**Answer questions (4) and (5) below only for arbitration claims or civil litigation filed on or after 05/18/2009**

**4.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated, arbitration claim or civil litigation which alleged that the individual was *involved* in one or more *sales practice violations*, and which:

    **(a)** was settled for an amount of $15,000 or more, or;

    **(b)** resulted in an arbitration award of civil judgment against any named respondent(s)/defendant(s), regardless of amount?

**5.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an investment-related, consumer-initiated, arbitration claim or civil litigation not otherwise reported under question 7E(4) above, which:

    **(a)** would be reportable under question 14I(5)(a) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*; or

    **(b)** would be reportable under question 14I(5)(b) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*.

**Termination Disclosure**

Yes   No

**7F.** Did the individual voluntarily *resign* from your *firm*, or was the individual discharged or permitted to *resign* from your *firm*, after allegations were made that accused the individual of:

    **1.** violating *investment-related* statutes, regulations, rules or industry standards of conduct?     ○   ◉

    **2.** fraud or the wrongful taking of property?     ○   ◉

    **3.** failure to supervise in connection with *investment-related* statutes, regulations, rules or industry standards of conduct?     ○   ◉

---

## 8. Signature

Please Read Carefully

All signatures required on this Form U5 filing must be made in this section.

A "Signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic form filing, a signature is effected by typing a name in the designated signature field. By typing a name in this field, the signatory acknowledges and represents that the entry constitutes in every way, use, or aspect, his or her legally binding signature.

  **8A.** FIRM ACKNOWLEDGMENT

      This section must be completed on all U5 form filings submitted by the *firm*.

  **8B.** INDIVIDUAL ACKNOWLEDGMENT AND CONSENT

      This section must be completed on amendment U5 form filings where the individual is submitting changes to Part II of the INTERNAL REVIEW DRP or changes to Section 2 (CURRENT RESIDENTIAL ADDRESS).

### 8A. FIRM ACKNOWLEDGMENT

I VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN AND WITH THIS FORM.

**Person to contact for further information**

Stephen E. Abrams

**Telephone # of person to contact**

303-328-9271

**Signature of *Appropriate Signatory***

Stephen E. Abrams

**Date (MM/DD/YYYY)**

12/05/2017

**Signature** _____

---

### Criminal DRP

No Information Filed

### Customer Complaint DRP

No Information Filed

### Internal Review DRP

No Information Filed

### Investigation DRP

Case 3:20-cv-00195-GCM   Document 3-1   Filed 03/30/20   Page 33 of 46

No Information Filed

**Regulatory Action DRP**

No Information Filed

**Termination DRP**

No Information Filed

© 2017 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.
Privacy │ Legal │ Terms & Conditions

# EXHIBIT E

# PROMISSORY NOTE

James Anthony Warfield (the "**BORROWER**"), Donald Edwin Warfield ("**Guarantor**") and
William Everett Dodge Jr. ("the "**LENDER**") hereby enter into and execute this agreement (the
"**Agreement**" or "**Promissory Note**" as of this date, *February 8, 2018* .

1. **PARTIES**
   a. **Borrower -** James A. Warfield residing at 1231 Reverdy Lane, Mathews, North
      Carolina 28105.
   b. **Guarantor (Cosignatory) -** Donald E. Warfield residing at 6228 121st Ave SE,
      Bellevue, Washington 98006.
   c. **Lender** – William E. Dodge, Jr. residing at 474 Sycamore Avenue, Shrewsbury, New
      Jersey 07702.

2. **PROMISES TO PAY FOR VALUE RECEIVED**
   a. Borrower promises to pay the Lender or his estate monthly, commencing with his first
      payroll check direct deposited in accordance with paragraph 2 c. below, 1/60th of the
      total principal amount of $125,000 and 1/60th of the total interest calculated thereon in
      advance at the rate of 4.0% per annum for a period of 5 years (60 month).
   b. This Promissory Note (hereinafter "Note") will be repaid in consecutive monthly
      payments of $2,534.69 each, commencing with his first payroll check direct deposited
      in accordance with paragraph 2 c. below with the balance owing under this Note being
      paid on February 1, 2023.
   c. The Borrower will secure monthly payments by directing his employer at the time he is
      hired to make direct deposit of salary, commissions, and other compensation to the
      Bank of America checking account in the name of James A. Warfield Household
      Revocable Living Trust.
   d. The Borrower promises, and hereby instructs the Trustees of the James A. Warfield
      Household Revocable Living Trust ("Warfield Revocable Household Trust") to use the
      proceeds of this Note to satisfy any and all outstanding debts owed by the Borrower to
      the Internal Revenue Service of the United States, the state of North Carolina, and any
      other indebtedness up to a maximum of $125,000, immediately upon receipt of the of
      funds transferred by wire or intra bank transfer by the Lender to the checking account
      of the Warfield Revocable Household Trust at the Bank of America.
   e. No extension of the time for the payment of this Note, nor any amendment or
      modification of any term or provision of this Note, shall operate to release, discharge,
      modify, change, or affect the obligations of the Borrower, or any guarantor hereto or of
      any person assuming this Note, either in whole or in part, unless Lender agrees
      otherwise in writing.
   f. This Note may be changed only by an agreement signed by the party against whom
      enforcement of waiver, change, modification, or discharge is sought.

1

3. **PLACE OF PAYMENT**
   a. Payment of this Note shall be made to the Lender by mail at the Lender's address or wire, or intra bank transfers, to the account of the Lender's direction at the Bank of America or any other bank the Lender might specify.

4. **EARLY PAYMENT**
   a. At any time while not in default under this Note, the Borrower may instruct the Trustees of the Warfield Revocable Household Trust to pay the total outstanding balance of principal then owing without regard for future scheduled interest or penalty, provided said Trust has adequate funds to do so.

5. **CONDITIONS OF DEFAULT**
   a. Notwithstanding anything to the contrary in this Note, if the Borrower defaults in the performance of any obligation under this Note, then the Lender may declare the principal amount owing interest due under this Note at that time to be immediately due and payable.
   b. All costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by the Lender in enforcing this Note as a result of any default by the Borrower, will be added to the principal then outstanding and will immediately be paid by the Borrower.

6. **SEVERABILITY**
   a. If any term, covenant, condition, or provision of this Note is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the intent of the parties that such provisions be reduced in scope by the court only to the extent deemed necessary by the court to render that provision reasonable and enforceable and the remainder of the provisions of this Note will in no way be affected, impaired or invalidated as a result.

7. **JURISDICTION**
   a. This Note will be construed in accordance with and governed by the laws of the State of New Jersey.
   b. The Maker, any guarantor, or any person assuming the obligations of the Borrower herein, hereby expressly waives the benefits of any statute or rule of law or equity now provided, or which may hereinafter be provided, which would produce a result contrary to or in conflict with the foregoing.

8. **HEADINGS**
   a. The Section Headings herein are not part of this Note. The Headings are included solely for convenience, they are not intended to be full or accurate descriptions of the contents of the underlying section, and are not to be construed as part of this Note.

2

## 9. NOTARIZED SIGNATURES

-------------------------------------------------------------

**IN WITNESS WHEREOF** the parties have duly affixed their signatures under seal on this the
_____ 8 _____ day of _____ FEB _____, 2017 2018

**SIGNED SEALED AND DELIVERED**

this the _____ 8 _____ day of

_____ February _____, 2018

_____
James A. Warfield, Borrower

_____

**SIGNED SEALED AND DELIVERED**

this the _____ 6 _____ day of

February _____, 2018

_____
Donald E. Warfield, Guarantor

**SIGNED SEALED AND DELIVERED**
this the _____ 7 _____ day of

February _____, 2018

_____
William E. Dodge, Jr, Lender

3

# EXHIBIT F

## WARD AND SMITH, P.A.

GARY J. RICKNER, Attorney at Law

751 Corporate Center Drive
Suite 300 (27607)
Post Office Box 33009
Raleigh, NC 27636-3009

P: 919.277.9271
F: 919.277.9177
gjr@wardandsmith.com

January 16, 2019

Dr. Craig Callahan
President
ICON Advisers, Inc.
5299 DTC Blvd., Suite 1200
Greenwood Village, CO 80111

RE:  James Warfield v. ICON Advisers, Inc.
     Our File:  181429-00001

Dear Dr. Callahan:

This law firm represents James Warfield in connection with his claims against ICON Advisers, Inc. ("ICON").  Please accept this letter as notice of our representation and forward any future correspondence directly to my attention.

## PRESERVATION NOTICE

Before addressing the substantive and legal issues involved in this case, please note that this letter serves as a preservation notice to ICON.  We hereby demand that ICON protect and preserve all documents and communications in its possession, custody, or control, including all metadata, which relate to, refer to, or are associated with Mr. Warfield and/or his employment.  For purposes of this demand, "documents" means all complete originals and all non-identical copies (whether different from the original because of notations on the copy or otherwise) of any written, typed, printed, computer-stored, transcribed, taped, recorded, or graphic matter of every type and description, however and by whomever prepared or disseminated, including but not limited to correspondence, contracts, handwritten notes, invoices, files, reports, working papers, charts, graphs, brochures, proposals, outlines, histories, calendars, diaries, agendas, text messages, electronic mail in native and hard-copy form (whether opened or unopened, active or deleted, and drafts even if unsent), any other computer material (including print-outs, disks and computer files), and other evidence related in any way to Mr. Warfield's employment, his complaints as set forth herein, and any other matters related to this potential litigation.  In preserving such documents, ICON must suspend any routine procedures that may exist for destroying or deleting any such documents.

## FACTUAL BACKGROUND

Mr. Warfield initially was employed by ICON as Wholesaler for the Southeast Region.  Suffice it to say that Mr. Warfield was excited for this opportunity.  Mr. Warfield did not hide the fact that he had faced significant challenges in his life and career leading up to his employment with ICON.  This included weathering the storm of the recent financial crisis, while supporting a spouse suffering from addiction issues who was in and out of rehab, dealing with his own recovery from alcoholism, and ultimately

experiencing a messy divorce leaving him as a single father to five children. These challenges left a mark—specifically tax liens, which were disclosed to ICON during the interview process.

It was evident to all that Mr. Warfield worked very hard to overcome these challenges. ICON was impressed and offered him the wholesaler position. There was even discussion at that time that Mr. Warfield may be a future candidate for ICON's National Sales Director (NSD) position. Mr. Warfield was enthusiastic in accepting the job and began his employment on May 1, 2017.

By any account, Mr. Warfield's employment with ICON was an immediate success. This is evidenced by the fact that ICON asked Mr. Warfield to lead a presentation on practice management at its national sales meeting occurring in June 2017—just one month after he was hired. In the following months, ICON began looking to Mr. Warfield to lead the sales staff and assist other underperforming peers. By September 2017—only four months after beginning his employment—Mr. Warfield had proven his worth and ICON formally offered him the NSD position.

From that point forward, Mr. Warfield was immediately thrown into the NSD transition process, while still performing his duties as a regional wholesaler. Mr. Warfield became heavily involved in the recruiting process and hiring decisions, the planning of the 2018 national sales meeting, and was asked to determine a new budget for the upcoming year, all while negotiating the terms of his new position. Despite being pulled in multiple directions, the evidence shows that he continued to perform his regional wholesaler duties at a high level. Indeed, as of October 3, 2017, Mr. Warfield's region was ranked second overall resulting in congratulatory messages to Mr. Warfield, including an email from ICON's Chief Marketing Officer Brian Callahan stating: "Nice work!"

Over the next few weeks, Mr. Warfield continued to negotiate the terms of his new agreement with ICON's then General Counsel, Donald Salcito. Among other things, both Mr. Salcito and Mr. Warfield agreed that the agreement would address the resolution of Mr. Warfield's tax liens. ICON had offered Mr. Warfield a loan; however, Mr. Warfield was able to negotiate more favorable terms from a personal contact. Thus, Mr. Salcito insisted that any agreement include language stating that ICON was relying on Mr. Warfield's representations that he had secured financing to satisfy his outstanding obligations to the IRS. Mr. Warfield agreed to these terms and notified Mr. Salcito on October 19, 2017, that he formally accepted the offer to become ICON's NSD. The next day, October 20, 2017, ICON Chief Financial Officer Brian Harding emailed Mr. Warfield, stating: "Alright, that is great news!!!"

Thereafter, on October 24, 2017, Mr. Callahan emailed Mr. Warfield a draft Agreement for the NSD position. Despite all the momentum and positive efforts that had led to this moment, somehow everything inexplicably fell apart in the week that followed. In perhaps the first sign that something was amiss, Mr. Callahan emailed Mr. Warfield on October 25, 2017, indicating that he wanted to meet to discuss various work topics, as well as Mr. Warfield's "mental well-being." Mr. Warfield ignored this apparent slur and instead continued to focus on his job, including ongoing recruiting efforts, developing sales strategies for the upcoming calendar year, creating a budget, and fine-tuning the final terms of the NSD Agreement. This process culminated in email exchange between Mr. Warfield and Mr. Salcito on November 1, 2017, where Mr. Salcito advised Mr. Warfield that he was free to execute the Agreement

despite the fact that it referenced an October date instead of November. Mr. Salcito emailed: "Not that important. Just date it November 1."

The following morning, Thursday, November 2, 2017, without prior notice or explanation, Mr. Salcito informed Mr. Warfield in an email that the NSD offer was withdrawn, stating:

> ICON's National Sales Director offer to you is withdrawn. You will not be the ICON National Sales Director. ICON will be posting for the position of National Sales Director. You can continue as RVP in your territory, if you think you are capable, but it will be as a normal RVP. . . .

Understandably, Mr. Warfield reached out to Mr. Salcito immediately to discuss this shocking change. In response, Mr. Salcito aggressively said that he had lost confidence in Mr. Warfield and reiterated what was stated in the email, before hanging up on Mr. Warfield. Mr. Warfield called back and left a message when Mr. Salcito failed to answer. Later that same day, Mr. Warfield spoke to Mr. Salcito along with ICON's Associate General Counsel, Stephen Abrams. During this call, Mr. Salcito falsely accused Mr. Warfield of making misrepresentations concerning the loan he obtained to pay off his IRS obligations and criticized Mr. Warfield's initial budget proposal. In ending the conversation, Mr. Salcito told Mr. Warfield that if he wanted to be NSD, he should "come back to us when you are a human being," before suggesting: "Perhaps you need help. Go talk to someone."

Devastated by this sudden change of course, Mr. Warfield reached out to both you and Mr. Salcito requesting reconsideration. These efforts were denied. Then, the following Monday, November 6, 2017, again without prior notice or explanation, Mr. Callahan called Mr. Warfield to inform him that his employment was terminated. In a weak effort to support this unfortunate decision, Mr. Callahan referred to a few minor issues that had occurred months earlier—before ICON had even offered Mr. Warfield the NSD promotion. He also reiterated Mr. Salcito's criticism regarding the proposed budget, as well as his false allegation that Mr. Warfield misrepresented the personal loan he obtained. He made no attempt, however, to explain why these issues disqualified Mr. Warfield from the NSD position that everyone had enthusiastically supported and celebrated only one week earlier, let alone why it necessitated the termination of his employment in the original regional wholesaler position.

In the truest form of adding insult to injury, one month later on December 6, 2017, Mr. Warfield received a letter from Stephen Abrams enclosing the Form U5 Uniform Termination Notice that ICON filed with the Financial Industry Regulatory Authority (FINRA). To Mr. Warfield's surprise, the U5 did not reference any concerns regarding any alleged misrepresentation on his part, nor did it include any of the minor issues that Mr. Callahan referenced in the termination call one month earlier. Instead, ICON provided the following Termination Explanation:

Each of these purported reasons are demonstrably false. Purported concerns over Mr. Warfield's ███████████████████ are belied by the fact that ICON had promoted him and was celebrating his new position up until days before he was terminated. Moreover, Mr. Warfield was never criticized at any point on these bases and was even asked to lead a presentation ████████ at ICON's 2017 summer sales meeting. Finally, there simply is no basis for the suggestion that ICON had difficulty ████████████████████████████████████



## LEGAL CLAIMS AND DAMAGES

In light of the above and based on our investigation of this matter, we believe Mr. Warfield has multiple claims against ICON arising out the wrongful termination of his employment. First, although we understand ICON may take the position that Mr. Warfield was employed on an at-will basis, courts have held that, in the context of FINRA arbitrations, the very agreement to arbitrate employee discharges "implies a requirement that discharges be only for 'just cause.'" *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 313 (7th Cir. 1981).

> This process [arbitration] necessarily alters the employment relationship from at-will to something else—some standard of discernable cause is inherently required in this context where an arbitration panel is called on to interpret the employment relationship. . . . Accordingly, the arbitration panel had the power to determine whether the firing was justified.

*Paine Webber, Inc. v. Agron*, 49 F.3d 347, 352 (8th Cir. 1995). Sound public policy and equity should preclude ICON from terminating Mr. Warfield without cause. *Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 461 (D. Md. 2015).

Second, the unusual nature and timing of ICON's decision strongly suggests that its stated reasons for termination are pretextual—meaning that the stated reasons appear to be a cover-up or excuse for the real reason. In this case, ICON's real reason more likely is found in Mr. Salcito's bizarre and offensive comments to Mr. Warfield that he should "go talk to someone" because he "needed help" and should come back when he was a "human being." When viewed in context of Mr. Callahan's earlier statement to Mr. Warfield that he wanted to discuss his "mental well-being," it is clear that Mr. Salcito's comments were directed at Mr. Warfield's perceived or actual personal issues—specifically, his ongoing recovery from alcoholism. As you should know, an alcoholic is a person with a disability and is entitled to protection under the Americans with Disabilities Act (ADA). It is illegal for an employer to discriminate against an alcoholic who is qualified to perform the essential functions of a job.

Third, as previously stated, ICON's stated reasons for termination set forth in the U5 Notice are demonstrably false. These false statements directly attack Mr. Warfield's personal and professional reputation, and damage him in his ability to continue working in the financial services industry. It is

obvious, particularly in light of the fact that ICON was celebrating Mr. Warfield's acceptance of the NSD position up until the point at which Mr. Salcito abruptly changed course, that ICON made the statements knowing that they were false and with malice. In this regard, ICON's conduct constitutes defamation *per se* under North Carolina law, allowing Mr. Warfield to recover compensatory and punitive damages.

Fourth, ICON's defamation of Mr. Warfield constitutes an unfair and deceptive trade practice under N.C. Gen. Stat. § 75-1.1 *et seq.*, North Carolina's Unfair and Deceptive Trade Practices Act. Indeed, ICON disseminated false information about Mr. Warfield in an effort to harm him in his profession and influence consumers and the marketplace. As such, Mr. Warfield may seek treble damages and attorneys' fees in any action against ICON.

Without question, Mr. Warfield has suffered significant financial damage and severe emotional distress as a result of ICON's conduct. Prior to instituting an arbitration to recover for these injuries, we welcome the opportunity to discuss this matter with you in the hope of reaching a mutually acceptable resolution. We understand that you may wish to avoid publication of these sensitive matters and the expenses resulting from protracted litigation. If you would like to discuss this matter further, please contact me no later than January 25, 2019. Otherwise, if we do not hear from you, we will proceed with our claims as described herein.

We appreciate your attention to this matter and look forward to hearing from you.

Yours very truly,

Gary J. Rickner

cc:    Mr. James Warfield
       Jeremy R. Sayre, Esq.
       Marla S. Bowman, Esq.

# EXHIBIT G

 
5299 DTC Boulevard, Suite 1200
Greenwood Village, CO 80111
800.828.4881 phone | 303.790.1600 local
www.InvestwithICON.com

Gary J. Rickner, Esq.
Warden and Smith, P.A.
751 Corporate Center Drive
Suite 300
Raleigh, NC 27607

Dear Mr. Rickner

This is a response to your letter addressed to Craig Callahan dated January 16, 2019. Mr. Warfield's claims are denied in their entirety, they are false and full of misrepresentations.

We believe Mr. Warfield violated numerous FINRA rules and ICON policies while at ICON. We estimate that Mr. Warfield owes ICON at least $97,000.00 pursuant to the terms of his offer letter, plus an undetermined amount for our other claims, including breach of loyalty and honesty. We did not pursue these claims upon his termination because of Mr. Warfield's economic circumstances. Please accept this letter as a demand for the money he owes ICON. We assume you have advised your client on the many ways FINRA will enforce an unpaid award.

We are concerned that your client may attempt to purge or destroy evidence. We request and demand your client to preserve all documents, communications, notes, hand written or electronic, and all electronic media (collectively "documents") in his possession, custody, or control which in any way relate to, concern or are associated with his employment or potential employment, direct or indirect, with ICON. Such documents shall include, but shall not be limited to documents relating to: a) his application or attempt to obtain employment at ICON, as the National Sales Director (NSD) or otherwise, b) his communications with Bill Dodge, or any other individuals concerning, relating to or otherwise connected to his attempt to secure the NSD position, c) his attempt to secure financing to satisfy liens by the IRS, the state of North Carolina or any other governmental agency, or any other entity or person levied against him, or any other debts outstanding against him while employed or during the time he sought employment at ICON, and d) all documents relating to his position while at ICON and his misuse of ICON property.

Please address all future communication to me (dsalcito@iconadvisers.com) and Christopher Ambruso (cambruso@iconadvisers.com).

Regards,

Donald Salcito

cc:     Christopher Ambruso, Esq.